# IN THE UNITED STATES DISTSRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

MARCUS D. THOMAS,        )
     Plaintiff,         )
                   )     **Case No. 1:18-cv-00048**
v.                      )     **Judge Campbell / Frensley**
                   )
JAMIE GARNER, et al.,     )
     Defendants.        )

## REPORT AND RECOMMENDATION

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court upon two Motions for Summary Judgment: the first, filed by Defendant Debra Kelley (Docket No. 38); and the second, filed by Defendant Joseph Soldo (Docket No. 54).[1]  In support of their Motions, each Defendant has filed a supporting Memorandum of Law.  Docket Nos. 38-4; 56.  Additionally, Defendant Kelley has filed her Declaration (Docket No. 38-1), the Declaration with Exhibits of Brenda Pevahouse (Docket No. 38-2), the Declaration of Jammie Garner, RN (Docket No. 38-3), and a Statement of Undisputed Material Facts (Docket No. 38-5). Defendant Soldo incorporates Defendant Kelley's filings and has also filed his Declaration (Docket No. 54-3), as well as a Statement of Undisputed Material Facts (Docket No. 55).

Plaintiff has filed a Response and supporting Memorandum of Law regarding Defendant Kelley's Motion for Summary Judgment but has not responded to Defendant Kelley's Statement

---

[1] Also pending before the Court are Plaintiff's Motion to Clarify Docket No. 10 (Docket No. 32); Defendant Kelley's Motion for Sanctions, or in the Alternative, Motion to Dismiss for Lack of Prosecution (Docket No. 45); and Defendant Soldo's Motion to Dismiss (Docket No. 49). Because the undersigned recommends granting the instant Motions for Summary Judgment and dismissing this action with prejudice, acceptance of this Report and Recommendation will moot the remaining pending Motions. Accordingly, the undersigned will not further discuss them herein.

1

of Undisputed Material Facts.  Docket Nos. 43, 44.

Plaintiff has not responded either to Defendant Soldo's Motion for Summary Judgment or to his Statement of Undisputed Material Facts.

Plaintiff filed his Amended Complaint in this pro se, in forma pauperis action pursuant to 42 U.S.C. §1983, alleging that Defendants violated his Eighth Amendment rights by failing to provide him with adequate medical care for his inguinal hernia.  Docket No. 18.  Plaintiff avers that he was "denied the proper medication to prevent harmful side effect withdrawals due to the body builder lifestyle," during which he took high dose steroids.  *Id.*  Plaintiff further avers that his testicle became "the size of a grapefruit" and that he was seen by Defendants Soldo and Kelley, as well as by urologist Dr. McKnight,[2] but that he was sent back to his cell without actually receiving medical treatment. *Id.* Plaintiff contends that the swelling became "so bad and unbearable [that he could not] even use the restroom without secreting semen upon pushing while having a bowel movement."  *Id.* Plaintiff avers that Defendants brought him to the clinic and issued him "a prosthetic devise, called a scrotal support, to be worn … indefinitely."  *Id.* Plaintiff further avers that he received several ultrasounds, which revealed that he had a mass in the right groin region.  *Id.* Plaintiff argues that although he has been seen in clinic since the discovery of the mass, Defendants have failed to biopsy the mass to determine whether it is malignant or benign.  *Id.* Plaintiff avers that he "has had a swollen testicle for going on 5-years," that he is living in severe pain "and now experiencing the smell of death," such that he "is now at risk of suicidal thoughts as it is effecting his mental health."  *Id.* Plaintiff asserts, "[d]ue to the fact that the Defendant's [*sic*] have deliberately refused to provide the Plaintiff with medical care, he is now losing his testicle, no longer able to obtain an erection, smells of rotting flesh and

---

[2] Dr. McKnight was terminated as a party to the instant action on September 14, 2018.

there is a more than reasonable probability that he has advanced stages of cancer going untreated." *Id.*

Plaintiff sues Defendants in their individual and official capacities, seeking declaratory and injunctive relief, as well as compensatory and punitive damages. *Id.* Plaintiff additionally requests a jury trial and recovery of costs and any other "relief this Court deems just, proper, and equitable." *Id.*

In her Motion and supporting materials, Defendant Kelley argues that: (1) Plaintiff has failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act; and (2) she was not deliberately indifferent to Plaintiff's serious medical need because Plaintiff received numerous ultrasounds and referrals to see the doctor, the urologist, and the surgeon; was provided with Toradol, ibuprofen, and Naprosyn; and was provided with a scrotal support device. Docket No. 38-4. Defendant Kelley further argues that Plaintiff was a no show to numerous sick calls and appointments, and also notes that Plaintiff refused ibuprofen for pain. *Id.* Defendant Kelley contends that the urologist, Dr. McKnight, opined that Plaintiff's pain was a result of Plaintiff's prior varicocele ligation and he did not recommend surgery for the hydrocele. *Id.* Defendant Kelley asserts that Plaintiff's hydrocele continued to be monitored, and Plaintiff received two additional ultrasounds. *Id.* Defendant Kelley notes that as a result of these two additional ultrasounds, urologist McKnight recommended that Plaintiff receive a general surgical consultation for inguinal node sampling. *Id.* Defendant Kelley argues that Plaintiff visited the outside surgeon on November 13, 2018, but the surgeon did not discover any inguinal lymphadenopathy. *Id.* Accordingly, Defendant Kelley contends that Plaintiff cannot satisfy the objective prong of his Eighth Amendment medical claim, such that she is entitled to a judgment as a matter of law.

Plaintiff responds that he had an inguinal hernia as early as 2010 and that his inguinal hernia was repaired by Dr. Greene on August 15, 2019, but that his symptoms got progressively worse "in the form of increased pain, increased swelling, emitting semen when defecating, bad smells, and an increased size [*sic*] of a cyst and mass." Docket No. 44. Plaintiff further responds that the medical record reveals that, between July 28, 2016 and June 25, 2018, he underwent five ultrasounds, and that, a sixth ultrasound was recommended on November 18, 2018, but this sixth ultrasound was not conducted. *Id.* Plaintiff details the medical treatment Defendants provided him (*see, id.* at pp. 9-12), and he argues that this treatment was inadequate and could be regarded to have caused him harm or "be perceived as a risk or harm and the Defendant's [*sic*] disregarded them." *Id.*

In his Motion and supporting materials, Defendant Soldo argues that: (1) Plaintiff has failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act; and (2) he was not deliberately indifferent to Plaintiff's serious medical need because it is undisputed that Plaintiff was provided extensive and appropriate medical treatment at SCCF, "including by Defendant until his resignation on February 26, 2018." Docket No. 56. Defendant Soldo further argues that the evidence establishes that, at all times relevant to the case at bar, Defendant made informed and well-reasoned medical decisions concerning Plaintiff's medical care. *Id.* Defendant Soldo contends that "Plaintiff has failed to show that the extensive medical care provided for his scrotal pain and swelling was so 'grossly inadequate' that an Eighth Amendment violation occurred," such that he is entitled to a judgment as a matter of law. *Id.*

As has been noted, Plaintiff has failed to respond to either Defendant Soldo's Motion for Summary Judgment or his Statement of Undisputed Material Facts.

For the reasons set forth below, the undersigned finds that Plaintiff has failed to exhaust

4

his administrative remedies, as required under the PLRA. The undersigned further finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendants' Motions for Summary Judgment (Docket Nos. 38. 54) be GRANTED, and that this action be DISMISSED WITH PREJUDICE.

## II. UNDISPUTED FACTS[3]

### A.     Declaration of Brenda Pevahouse

Brenda Pevahouse is employed by CoreCivic, Inc., as the Grievance Chairperson at South Central Correctional Facility ("SCCF"). Docket No. 38-2, Declaration of Brenda Pevahouse ("Pevahouse Dec."), ¶ 2.  As the Grievance Chairperson, Ms. Pevahouse is familiar with all applicable Tennessee Department of Correction ("TDOC") requirements and policies governing an inmate's use of the grievance system. *Id.*, ¶ 3.

SCCF follows the TDOC policy that allows inmates to submit a written complaint / grievance concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within SCCF, which personally affects the inmates. *Id.*, ¶ 4.

Upon arrival at SCCF, each inmate is given an inmate handbook, which contains the grievance procedure. *Id.*, ¶ 5. The grievance policy requires an inmate to submit a grievance within "seven calendar days of the occurrence giving rise to the grievance." *Id.*, ¶ 6. Pursuant to TDOC policy, an inmate is also required to provide specific details such as "dates, times, and the names of the persons involved, " in the occurrence giving rise to the grievance, and if an inmate fails to name a staff member or employee in said grievance, the inmate has not exhausted the

---

[3] Unless otherwise noted, the following Facts are in a form required by Fed. R. Civ. P. 56 and are undisputed.

5

grievance procedure with respect to the actions of that staff member or employee. *Id.*, ¶ 7.

Grievances may be returned as inappropriate if an inmate attempts to grieve inappropriate matters such as institutional placement, classification, or Security Threat Group program placement. *Id.*, ¶ 8. An inappropriate grievance will be returned to an inmate, who can then appeal its designation as inappropriate or refile an appropriate grievance that complies with TDOC policy. *Id.*, ¶ 9.

Pursuant to TDOC policies and procedures, an inmate has exhausted his administrative remedies when the inmate has filed an appropriate and proper grievance and appealed the response all the way through the TDOC Commissioner's Office. *Id.*, ¶ 10.

SCCF maintains records of all inmate grievances properly filed and those inmate grievances are recorded in the Tennessee Offender Management Information System ("TOMIS"), a computerized database for the TDOC. *Id.*, ¶ 11. However, when an inmate submits a grievance that does not follow grievance policies and procedures, that grievance is returned to the inmate with an explanation as to its deficiencies. *Id.*

Plaintiff arrived at SCCF on approximately February 4, 2016. *Id.*, ¶ 12. Grievance Chairperson Pevahouse has reviewed TOMIS to determine what grievances Plaintiff had filed. *Id.*, ¶ 13. Based on her review of the grievance database, Plaintiff filed no grievances at SCCF during the time period between February 4, 2016 and July 2, 2018. *Id.*

### B. Declaration of Joseph P. Soldo, D.O.

Dr. Soldo is licensed by the State of Tennessee as a medical doctor, who was employed as a medical doctor and medical director at SCCF until February 26, 2018. Docket No. 54-3, Declaration of Joseph P. Soldo, D.O. ("Soldo Dec."), ¶ 2. Dr. Soldo was, at all times relevant to the instant action, familiar with the applicable TDOC requirements and policies governing an

inmate's access to healthcare and the providing of medical care in a correctional setting. *Id.*, ¶ 4. Additionally, Dr. Soldo was adequately trained on all applicable SCCF and TDOC policies. *Id.,* ¶ 2.

SCCF follows the TDOC policy concerning the access to healthcare for inmates. *Id.*, ¶ 9. Under these policies and procedures, all inmates are provided timely access to the appropriate level of medical care. *Id.* Additionally, inmates are provided access to non-emergency health care services through the sick call process, whereby inmates are evaluated and treated for non-emergency health care requests by qualified health care professionals as required. *Id.*

Upon arrival at SCCF, each inmate is given an inmate handbook, which contains information on how to gain access to healthcare, including instructions on submitting sick calls. *Id.*, ¶ 10. To initiate non-emergency treatment, inmates are instructed to fill out sick call request slips, explaining their complaint, and to place the completed slips in the secured box in their housing unit. *Id.*, ¶ 11. The slips are collected by a nurse, who will then refer inmates to see a medical provider as needed. *Id.* Notwithstanding, health services personnel are available twenty-four hours per day to handle emergencies, should they occur. *Id.*

If an inmate is suffering from an emergency medical issue, the inmate is instructed to advise the unit manager who will then notify the charge nurse on duty. *Id.*, ¶ 12. If deemed necessary, the inmate will be escorted to the medical department for further examination and treatment as required. *Id.*

As a doctor at SCCF, Dr. Soldo provided medical care to inmates incarcerated in the facility according to the applicable community standards in a correctional setting. *Id*, ¶ 3. During Dr. Soldo's treatment of Plaintiff, Dr. Soldo relied upon his training and expertise as a licensed medical doctor to provide him with the best treatment available based upon his judgment of

Plaintiff's needs and the community standards of doctors practicing in a correctional setting in the State of Tennessee. *Id.*, ¶ 6.

On May 9, 2017, Dr. Soldo referred Plaintiff to a urologist and prescribed ibuprofen 600 mg twice a day for thirty days based on Plaintiff's purported pain and after review of an ultrasound performed on May 1, 2017. *Id.*, ¶ 13.

On July 11, 2017, Plaintiff visited the off-site urologist, Dr. Donald T. McKnight. *Id.*, ¶ 14. Thereafter, Dr. Soldo reviewed Dr. McKnight's findings. *Id.* Dr. McKnight's findings noted Plaintiff's pain in his right groin region and an enlarging scrotal mass; however, he espoused that while a "hydrocele treatment (aspiration, repair) would definitely reduce the mass effect, it would not help with the groin pain which is related to his prior procedure." *Id.* Based upon this finding, it was appropriate to continue to monitor the status of Plaintiff's condition and for Plaintiff to report any further concerns or changes. *Id.*, ¶ 15. Pursuant to the records, Plaintiff was provided appropriate medical care up and to the date Dr. Soldo resigned on February 26, 2018. *Id.*

Based upon Dr. Soldo's experience, training, knowledge, review of Plaintiff's medical records, and personal evaluation and treatment of Plaintiff, Dr. Soldo does not believe it was medically necessary for Plaintiff to receive any additional medication and/or treatment for any injuries or conditions that Plaintiff reported to him at any time relevant to Plaintiff's incarceration at SCCF or while Dr. Soldo was employed at SCCF. *Id.*, ¶ 16.

At all times during his interactions with, and treatment of, Plaintiff, Dr. Soldo provided Plaintiff with adequate, proper, and reasonable medical care. *Id.*, ¶ 7. At no point did Dr. Soldo deny Plaintiff appropriate medical care or cause him to suffer in an inappropriate manner, nor did Dr. Soldo ignore, disregard, or act with deliberate indifference towards any of Plaintiff's medical

needs. *Id.*, ¶¶ 5, 8, 17. At no time did Dr. Soldo intentionally deny Plaintiff any medical treatment when he had knowledge of Plaintiff's need or request. *Id.*, ¶ 17. In no way did Dr. Soldo implicitly authorize, approve, or knowingly acquiesce to, or personally participate in, any unconstitutional conduct concerning the Plaintiff during his incarceration at SCCF. *Id.* At all times relevant to the instant action, Dr. Soldo acted in good faith; he did not and has not acted with deliberate indifference towards Plaintiff's well-being. *Id.*

      C.     **Declaration of Debra Kelley, RN**

      Debra Kelley is a Registered Nurse who is licensed in the State of Tennessee and who is employed by CoreCivic, Inc. as a Nurse Practitioner at SCCF. *Id.*, ¶ 2. Nurse Kelley is familiar with all applicable TDOC requirements and policies governing an inmate's access to healthcare and the providing of medical care in a correctional setting. *Id.*, ¶ 4. Nurse Kelley is, and was, at all times relevant to this case adequately trained on all applicable policies of CoreCivic and TDOC. *Id., ¶* 2.

      SCCF follows the TDOC policy concerning the access to healthcare for inmates. *Id.*, ¶ 5. Under these policies and procedures, all inmates are provided timely access to the appropriate level of medical care. *Id.* Additionally, inmates are provided access to non-emergency health care services through the sick call process, whereby inmates are evaluated and treated for non-emergency health care requests by qualified health care professionals as required. *Id.*

      Upon arrival at SCCF, each inmate is given an inmate handbook, which contains information on how to gain access to healthcare, including instructions on submitting sick calls. *Id.*, ¶ 6. To initiate non-emergency treatment, inmates are instructed to fill out sick call request slips, explaining their complaint, and to place the completed slips in the secured box in their housing unit. *Id.*, ¶ 7. The slips are collected by a nurse, who will then refer inmates to see a

medical provider as needed. *Id.* Notwithstanding, health services personnel are available on-site twenty-four hours per day to handle emergencies, should they occur. *Id.*

If an inmate is suffering from an emergency medical issue, the inmate is instructed to advise the unit manager who will then notify the charge nurse on duty. *Id.*, ¶ 8. If deemed necessary, the inmate will be escorted to the medical department for further examination and treatment as required. *Id.*

As a Nurse Practitioner, Nurse Kelley provides medical care to inmates incarcerated in the facility. *Id.*, ¶ 3. During her treatment of Plaintiff, Nurse Kelley relied upon her training and experience as a nurse practitioner to provide him with the best treatment available based upon her judgment of what he needed and pursuant to the community standards of a nurse practitioner practicing in a correctional setting in the State of Tennessee. *Id.*, ¶ 10.

On April 3, 2017, Plaintiff presented to medical with complaints of right testicle swelling and pain for the prior four and a half months. *Id.*, ¶ 13. Nurse Kelley noted Plaintiff's previous scrotal surgery and the presence of a hydrocele. *Id.* Nurse Kelley referred Plaintiff to have an ultrasound for further evaluation. *Id.*

On April 28, 2017, Plaintiff presented to medical with testicle pain. *Id.*, ¶ 14. Plaintiff was treated by a nurse at the facility. *Id.* Nurse Kelley prescribed Toradol 30 mg to be injected intramuscular twice a day as needed. *Id.*

On May 1, 2017, an ultrasound of Plaintiff's testicular/scrotal area was performed, which Nurse Kelley later reviewed. *Id.*, ¶ 15. The ultrasound revealed the following:

> The right testicle measures 3.8 x 1.9 x 1.7 cm. Is homogeneous in echotexture demonstrating normal color Doppler flow. A hydrocele has increased in size in the interval . . . The Left testicle measures 3.7 x 1.8 x 1.9 cm and is homogeneous in echotexture demonstrating normal color Doppler flow. There is redemonstrations of a small epididymal head cyst on the left side measuring 1.1 x. 0.6 cm in greatest diameter. Otherwise the epididymis is normal in texture.

*Id.* Based on the findings, the doctor performing the ultrasound found an "increase in size of the previously noted" hydrocele and the previously mentioned "small left epididymal head cyst." *Id.*

On February 7, 2018, Nurse Kelley reviewed an outside urologist's report, which did not recommend surgery, and which revealed that plaintiff's pain was from a prior surgery. *Id.*, ¶ 16. In light of the report, Nurse Kelley decided to meet with Plaintiff to discuss the results of the report and provide a scrotal support device. *Id.*

On February 12, 2018, Nurse Kelley discussed the results of the urological examination with Plaintiff. *Id.*, ¶ 17. Plaintiff noted that the hydrocele had increased in size and was still painful. *Id.* Nurse Kelley ordered an ultrasound of the right groin soft tissue. *Id.* Nurse Kelley also provided Plaintiff a scrotal support device and prescribed Naprosyn 500 mg twice a day for 180 days as needed. *Id.*

On March 12, 2018, an ultrasound of Plaintiff's right inguinal region was performed and later reviewed by Nurse Kelley. *Id.*, ¶ 18. The evaluation of the right inguinal region showed "no solid or cystic masses," and concluded "[a] solid or cystic mass in the right groin region. No hernia is seen." *Id.*

On March 15, 2018, Nurse Kelley reviewed the previously ordered ultrasound, which revealed no abnormalities. *Id.*, ¶ 19. Because the urologist did not recommend surgery, Nurse Kelley recommended medical follow Plaintiff's progress and check him again in two months. *Id.*

At all times during her interactions with, and treatment of, Plaintiff, Nurse Kelley provided Plaintiff with adequate, proper, and reasonable medical care that meets the community standard of medical care in a prison setting. *Id.*, ¶ 11. At no point in time did Nurse Kelley deny Plaintiff appropriate medical care or treatment or cause him to suffer in an inappropriate manner when she had knowledge of his need or request, nor did Nurse Kelley ignore, disregard, or act

with deliberate indifference towards any of Plaintiff's medical needs. *Id.*, ¶¶ 9, 12, 20. At all times relevant to this case, Nurse Kelley acted in good faith, and in no way did Nurse Kelley implicitly authorize, approve, or knowingly acquiesce to, or personally participate in, any unconstitutional conduct concerning Plaintiff during his incarceration at SCCF. *Id.*, ¶ 20. Nurse Kelley did not, and has not, acted with deliberate indifference towards Plaintiff's well-being. *Id.*

### D. Declaration of Jammie Garner, RN

Jammie Garner is a Registered Nurse who has obtained the appropriate diplomas, certifications, and licenses, and who is employed by CoreCivic, Inc., as the Health Services Administrator at SCCF. Docket No. 38-3, Declaration of Jammie Garner, RN ("Garner Dec."), ¶ 2. Nurse Garner is, and was, at all times relevant to this case, adequately trained on all applicable CoreCivic, Inc. and TDOC policies. *Id.*, ¶ 3. Nurse Garner is familiar with all applicable TDOC requirements and policies governing an inmate's access to healthcare, and is also familiar with the community standards of medical care in a correctional setting. *Id.*

SCCF follows the TDOC policy concerning the access to healthcare for inmates. *Id.*, ¶ 4. Under these policies and procedures, all inmates are provided timely access to the appropriate level of medical care. *Id.* Additionally, inmates are provided access to non-emergency health care services through the sick call process, whereby inmates are evaluated and treated for non-emergency health care requests by qualified health care professionals as required. *Id.*

Upon arrival at SCCF, each inmate is given an inmate handbook, which contains information on how to gain access to healthcare, including instructions on submitting sick calls. *Id.*, ¶ 5. To initiate non-emergency treatment, inmates are instructed to fill out sick call request slips, explaining their complaint, and to place the completed slips in the secured box in their housing unit. *Id.*, ¶ 6. The slips are collected by a nurse, who will then refer inmates to see a

medical provider as needed. *Id.* Notwithstanding, health services personnel are available on-site twenty-four hours per day to handle emergencies, should they occur. *Id.*

If an inmate is suffering from an emergency medical issue, the inmate is instructed to advise the unit manager who will then notify the charge nurse on duty. *Id.*, ¶ 7. If deemed necessary, the inmate will be escorted to the medical department for further examination and treatment as required. *Id.*

As the Health Services Administrator, Nurse Garner has reviewed Plaintiff's medical file, which was kept in the regular course of business and treatment of Plaintiff; a true and accurate copy of which she has submitted. *Id.*, ¶ 8, Ex. A.

Plaintiff was provided an extensive amount of medical treatment from numerous providers while incarcerated at SCCF for his scrotal pain and swelling. *Id.*, ¶ 9.

On April 11, 2016, Plaintiff presented to medical with complaints of pain and swelling in his testicles. *Id.*, ¶ 10. Plaintiff was referred to a medical provider. *Id.*

On May 3, 2016, Plaintiff presented to an appointment with Dr. Robert Coble. *Id.*, ¶ 11. Dr. Coble noted Plaintiff's prior steroid use and surgery, which left him in pain. *Id.*

On July 28, 2016, an ultrasound of Plaintiff's testicular/scrotal area was performed, which was later reviewed by Dr. Coble. *Id.*, ¶ 12. The ultrasound revealed the following:

> Right testes measures 3.1 cm x 1.8 cm x 2.6 cm and has a uniform echotexture. Normal arterial flow. Negative increased vascularity. Small hydrocele. Right epididymis has normal appearance. Left testes measures 3 cm x 1.9 cm x 3 cm. Normal echotexture . . . Negative increased vascularity. Epididymis has any normal size of 1 cm, with a tiny cyst.

*Id.* Based on the report, the doctor performing the ultrasound found Plaintiff was negative for testicular torsion but did find the presence of a "small right hydrocele" and a "tiny left epididymal cyst." *Id.*

13

On September 1 and 18, 2016, Plaintiff was a no show to nurse sick call. *Id*., ¶¶ 13, 14.

On September 19, 2016, Plaintiff presented to medical regarding pain and swelling in his testicle and he requested a referral to a doctor. *Id.*, ¶ 15. The nurse offered Plaintiff ibuprofen or Tylenol for pain, but Plaintiff refused. *Id.* Plaintiff was referred to a doctor in response to his request. *Id.*

On December 2, 2016, Plaintiff was a no show for his appointment with the doctor requested on September 19, 2016. *Id.*, ¶ 16.

On January 25, 2017, February 21, 2017, March 20, 2017, and March 29, 2017, Plaintiff was a no show to nurse sick call. *Id.*, ¶¶ 17, 18, 19, 20.

On April 3, 2017, Plaintiff presented to Nurse Kelley with complaints of right testicle swelling and pain for the prior four and a half months. *Id.*, ¶ 21. Nurse Kelley noted Plaintiff's previous scrotal surgery and the presence of a hydrocele and referred Plaintiff to have an ultrasound for further evaluation. *Id.*

On April 28, 2017, Plaintiff presented to medical with testicle pain. *Id.*, ¶ 22. Plaintiff was treated by a nurse and also prescribed Toradol 30 mg by Defendant to be injected intramuscular twice a day as needed. *Id.*

On May 1, 2017, an ultrasound of Plaintiff's testicular / scrotal area was performed and later reviewed. *Id.*, ¶ 23. The ultrasound revealed the following:

> The right testicle measures 3.8 x 1.9 x 1.7 cm. Is homogeneous in echotexture demonstrating normal color Doppler flow. A hydrocele has increased in size in the interval . . . The Left testicle measures 3.7 x 1.8 x 1.9 cm and is homogeneous in echotexture demonstrating normal color Doppler flow. There is redemonstrations of a small epididymal head cyst on the left side measuring 1.1 x. 0.6 cm in greatest diameter. Otherwise the epididymis is normal in texture.

*Id.* Based on the findings, the doctor performing the ultrasound found an "increase in size of the previously noted" hydrocele and the previously mentioned "small left epididymal head cyst." *Id.*

14

On May 9, 2017, Plaintiff presented to medical with complaints of pain in testicles from prior surgery. *Id.*, ¶ 24. The doctor noted that the ultrasound showed the hydrocele worsening and referred Plaintiff to a urologist. *Id.*

On July 11, 2017, Plaintiff presented to urologist, Dr. McKnight, who reviewed Plaintiff's prior medical records and spoke to Plaintiff, which revealed the following: "[Plaintiff] was a former body builder using steroids and that while on cycle his testicles would shrink only to return to normal size once he used hcg. When his last cycle the size didn't return and sought help from a urologist who attributed the small size to bilateral varicoceles which he repaired through groin incisions. Since then he has had pain in the R groin and an enlarging scrotal mass. The pain radiates to the [right lower quadrant] and is made worse with activity, better with rest." *Id.,* ¶ 25. For treatment Dr. McKnight did not recommend surgery. *Id.* Instead, he noted "[t]hough a hydrocele treatment (aspiration, repair) would definitely reduce the mass effect, it would not be expected to help with the groin pain which is related to his prior procedure. As an aside, I suspect the hydrocele itself is another side effect of his varicocele ligation." *Id.*

On July 19, 2017, August 2, 2017, August 10, 2017, August 14, 2017, August 15, 2017, August 18, 2017, September 7, 2017, October 17, 2017, and October 20, 2017, Plaintiff was a no show to nurse sick call. *Id.*, ¶¶ 26, 27, 28, 29, 30, 31, 32, 33, 34.

On February 7, 2018, Nurse Kelley reviewed an outside urologist's report, which did not recommend surgery, and which revealed that Plaintiff's pain was from a prior surgery. *Id.*, ¶ 35. In light of the report, Nurse Kelley noted her intention to meet with Plaintiff to discuss the results of the report and provide a scrotal support device. *Id.*

On February 12, 2018, Defendant discussed the results of the urological examination with Plaintiff. *Id.*, ¶ 36. Plaintiff noted that the hydrocele had increased in size and was still painful.

15

*Id.* Therefore, Nurse Kelley ordered an ultrasound of the right groin soft tissue, provided Plaintiff with a scrotal support devise, and prescribed Naprosyn 500 mg twice a day for 180 days as needed. *Id.*

On March 12, 2018, an ultrasound of Plaintiff's right inguinal region was performed and later reviewed by Nurse Kelley. *Id.*, ¶ 37. The evaluation of the right inguinal region showed "no solid or cystic masses," and the report concluded "[a] solid or cystic mass in the right groin region. No hernia is seen." *Id.*

On March 15, 2018, Nurse Kelley reviewed the previously ordered ultrasound, which revealed no abnormalities, and, because the urologist did not recommend the surgery, Nurse Kelley recommended medical follow Plaintiff's progress and check him again in two months. *Id.*, ¶ 38.

On June 25, 2018, an ultrasound of Plaintiff's right inguinal region was performed. *Id.*, ¶ 39. In the ultrasound, it was discovered there was a "suspected prominent lymph node in the area of concern" that did not "reach pathologic size proportions . . . measuring 2.8 cm x 1.9 x 2.1 cm." *Id.* The report concluded that the "[i]rregular mass . . . could be a lymph node. Ultimate diagnosis would require histologic verification." *Id.*

On October 10, 2018, Plaintiff presented to Dr. McKnight for a follow-up regarding the hydrocele. *Id.*, ¶ 40. At the visit, Dr. McKnight reviewed the ultrasound, which he determined described inguinal lymphadenopathy. *Id.* As a result, he recommended a general surgical consultation for "inguinal node sampling" and noted "[h]ydrocele repair will do nothing to help here." *Id.*

On November 18, 2018, Plaintiff presented to a general surgeon in response to Dr. McKnight's referral. *Id.*, ¶ 41. The general surgeon did not "feel any inguinal

lymphadenopathy," and recommended an ultrasound and "needle biopsy" of the inguinal lymph node if mass was still present. *Id.*

In no way did Nurse Garner implicitly authorize, approve, or knowingly acquiesce to, or personally participate in, any unconstitutional conduct concerning Plaintiff during his incarceration at SCCF. *Id.*, ¶ 42. At no time did Nurse Garner intentionally deny Plaintiff any medical treatment when she had knowledge of his need or request. *Id.* At all times relevant to this case, Nurse Garner acted in good faith; she did not and have not acted with deliberate indifference towards Plaintiff's well-being. *Id.*

## III. LAW AND ANALYSIS

### A.    Local Rules 7.01(b) and 56.01(c) and (g)

Local Rule 7.01(b) states, in pertinent part:

> **b.  Response.**  Each party opposing a motion shall serve and file a response, memorandum, affidavits and other responsive material not later than fourteen (14) days after service of the motion, except, that in cases of a motion for summary judgment, that time shall be twenty-one (21) days after the service of the motion, unless otherwise ordered by the Court.  Failure to file a timely response shall indicate that there is no opposition to the motion.

Defendant Soldo filed his Motion for Summary Judgment on July 10, 2020.  Docket No. 54.  Plaintiff has failed to respond to Defendant Soldo's Motion.

Additionally, with respect to Motions for Summary Judgment specifically, Local Rules 56.01(c) and (g) state, in pertinent part:

> **c.  Response to Statement of Facts.**  Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed.  Each disputed fact must be supported by a citation to the record. . . .
>
> . . .
>
> **g.  Failure to Respond.**  Failure to respond to a moving party's statement of

material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for the purposes of summary judgment.

Plaintiff has failed to respond to Defendants' Statements of Undisputed Material Facts or file his own Statement of Undisputed Material Facts. Pursuant to Local Rule 56.01(g), Plaintiff's failure to respond indicates "that the asserted facts are not disputed for the purposes of summary judgment." Accordingly, there are no genuine issues as to any material fact and all that remains to be determined is whether Defendants are entitled to a judgment as a matter of law.

### B. Motion for Summary Judgment

It would be inappropriate to grant Defendants Motions solely on the ground that Plaintiff has failed to respond.[4] *See Stough v. Mayville Community Schools*, 138 F. 3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of the movant simply because the adverse party has not responded. The Court is required, at a minimum, to examine the movant's Motion for Summary Judgment to ensure that he has discharged [his initial] burden ... The federal rules require that the party filing a Motion for Summary Judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted). The Court will, therefore, consider whether Defendants have met their burdens under the appropriate summary judgment standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[4] As noted, although Plaintiff has responded to Defendant Kelley's Motion, he has failed to respond to her Statement of Undisputed Facts, and he has failed to respond to either Defendant Soldo's Motion or Statement of Undisputed Facts.

18

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

Additionally, Fed. R. Civ. P. 56(c)(1) sets forth the requirement to support factual assertions as follows:

**(c) Procedures.**

**(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

**(A)** citing to particular parts of materials in the record, including

19

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**C.     42 U.S.C. § 1983**

**1.     Generally**

Plaintiff alleges violations of his Eighth Amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 18.  Section 1983 provides, in part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155 (1978).  The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326 (1941).

**2.     Eighth Amendment**

**a.     Generally**

The Eighth Amendment provides that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The United States Supreme Court has held that the constitutional prohibition of "cruel and unusual punishments" forbids punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (citations omitted).

In order to establish an Eighth Amendment claim, an inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### b. Deliberate Indifference To Serious Medical Needs

The State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Estelle,* 429 U.S. at 104.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. This is true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. at 104-05.

Not every prisoner's allegation of inadequate medical treatment, however, is a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105. For instance, courts have held that the accidental, inadvertent, or negligent failure to provide adequate medical care does not state such

a claim. *Id.* at 105-06 (citations omitted).

Pursuant to Supreme Court precedent, the Sixth Circuit held, in *Hunt v. Reynolds*, that Eighth Amendment deliberate indifference claims must contain both an objective component, "that [plaintiff's] medical needs were sufficiently serious," and a subjective component, "that the defendant state officials were deliberately indifferent to the plaintiff's needs." 974 F.2d 734, 735 (6th Cir. 1992) (citations omitted).

In order to satisfy the objective requirement, the Supreme Court requires that an inmate demonstrate evidence of a current harm or evidence of a medical complaint or condition of confinement that "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Under the Eighth Amendment, inmate plaintiffs, must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference. *Id.* (prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim).

As for the subjective element, the Sixth Circuit has held that "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993). There must, however, be a showing of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (*citing Westlake v. Lucas*, 537 F. 2d 857, 860 n. 3 (6th Cir. 1976)). In fact, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). The inquiry, therefore, according to the Sixth Circuit, is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X*, 175 F. 3d at 402 (*citing Farmer v. Brennan*, 511 U.S.

22

825, 837, 844 (1994)).

**D. Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e**

A prisoner must exhaust all available administrative remedies before filing a claim under §1983 or any other federal law. 42 U.S.C. §1997e(a). *See also, e.g., White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997); *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998); *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999). The Prison Litigation Reform Act of 1995 provides in pertinent part as follows:

> (a) **Applicability of Administrative Remedies**. No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis original).

Exhaustion is required even if the prisoner subjectively believes the remedy is not available, even if the state cannot grant the particular relief requested, and even if the prisoner believes the procedure to be ineffectual or futile. *Napier v. Laurel County*, 636 F.3d 218, 222 (6th Cir. 2011). Additionally, the filing of an initial grievance is not sufficient to satisfy the requirements of §1997e(a). Rather, the PLRA exhaustion of prison administrative remedies requires a prisoner to pursue his prison grievance through the final level of administrative appeal. *Hartsfield v. Vidor*, 199 F.3d 305, 306 (6th Cir. 1999). In *Hartsfield*, the Sixth Circuit explicitly stated:

> Even if Plaintiff did file an initial grievance against [defendants], he was required to continue to the next step in the grievance process . . . . We have previously held that an inmate cannot simply . . . abandon the process before the completion and claim that he has exhausted his remedies. . .

The PLRA requires "proper exhaustion," meaning that a prisoner's grievance must comply with the procedural rules and requirements of the prison or prison system in order for the

exhaustion requirement to be met. *Woodford v. Ngo,* 548 U.S. 81, 93 (2006). Prisoners must complete the administrative review process in accordance with the applicable procedural rules set by the prison grievance process. *Jones v. Bock,* 549 U.S. 199, 218 (2007). Pursuant to the PLRA, a prisoner's unexhausted claims cannot be brought into court. *Id.* at 211.

When a defendant shows that a plaintiff has not "exhausted all available state administrative remedies," the only remaining question is whether the plaintiff's claims have been brought with respect to "prison conditions" as that term is used in 42 U.S.C. § 1997e(a).

The Sixth Circuit discussed the meaning of the term "prison conditions" as used in 42 U.S.C. § 1997e(a) in *Freeman v. Francis*, 196 F.3d 641 (6th Cir. 1999). In *Freeman*, the plaintiff inmate brought a lawsuit against prison officials claiming that they had used excessive force against him. The lower court had dismissed his complaint for failure to exhaust administrative remedies. On appeal, the plaintiff argued in part that he was not required to exhaust his administrative remedies because his excessive force claim did not involve a "prison condition" within the meaning of §1997e(a). The *Freeman* Court stated in part as follows:

> The phrase "action . . . with respect to prison condition" is not defined in § 1997e. Because the question is one of statutory construction, we must first look to the plain language of the statute. Defendants argue that the term "prison conditions" as used in 18 U.S.C. § 3626(g)(2), which was amended as part of the same legislation as § 1997e, does include claims such as excessive force because it expressly includes "effects of actions of government officials on the lives of confined persons" as well as "conditions of confinement" in defining "prison conditions." . . . It is generally recognized that when Congress uses the same language in two different places in the same statute, the words are usually read to mean the same thing in both places. . . .

> Moreover, reading the term "prison conditions" to include claims of excessive force finds support in the purpose and legislative history of the Act. The Act was passed to reduce frivolous prisoner lawsuits and to reduce the intervention of federal courts into the management of the nation's prison systems. A broad exhaustion requirement that includes excessive force claims effectuates this purpose and maximizes the benefits of requiring prisoners to use prison grievance procedures before coming to federal court. Prisons need to know about and

24

address claims of excessive force as they would any other claim concerning prison life so that steps may be taken to stop problems immediately if they exist.

196 F. 3d at 643-644 (footnote omitted).

The U. S. Supreme Court has also held that "§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences." *See Porter v. Nussle*, 534 U.S. 516, 520, 122 S. Ct. 983, 986 (2002). As the *Porter* Court stated:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. . . . In other instances, the internal review might "filter out some frivolous claims." . . . And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.
>
> . . .
>
> For the reasons stated, we hold that the PLRAs exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

122 S. Ct. at 988, 992 (citations omitted, emphasis added).

### E.      The Case at Bar

As an initial matter, under the reasoning of *Porter* and *Freeman*, Plaintiff's claims in the case at bar fall within the meaning of the term "prison conditions" as used in § 1997e(a). He is, therefore, required to exhaust his administrative remedies as set forth in the PLRA.

It is undisputed that SCCF has a grievance procedure, which is set forth in the inmate handbook that is given to inmates upon their arrival at SCCF. *See* Pevahouse Dec., ¶¶ 4, 5, 6, 7, 8, 9. It is also undisputed that, pursuant to TDOC policies and procedures, an inmate has exhausted his administrative remedies when the inmate has filed an appropriate and proper grievance and appealed the response all the way through the TDOC Commissioner's Office. *Id.*,

¶ 10. Additionally, it is undisputed that SCCF maintains records of all inmate grievances properly filed, that those inmate grievances are recorded in TOMIS, and that a review of TOMIS reveals that Plaintiff filed no grievances at SCCF during the time period between February 4, 2016 and July 2, 2018. *Id.*, ¶¶ 11, 13. Accordingly, it is undisputed that Plaintiff has failed to exhaust his administrative remedies as required under the PLRA. Defendants are, therefore, entitled to a judgment as a matter of law.

Even if Plaintiff had exhausted his administrative remedies, however, the undisputed facts demonstrate that Plaintiff received regular and appropriate medical care that complied with the requisite standards; he was repeatedly prescribed various pain medications and received numerous ultrasounds, nurse visits, doctor visits, urologist visits, and a surgical consult. *See* Pevahouse Dec., *passim*; Soldo Dec.*, passim*; Kelley Dec., *passim*; Garner Dec., *passim.*

Additionally, it is undisputed that: (1) at all times during their interactions with, and treatment of, Plaintiff, Defendants provided Plaintiff with adequate, proper, and reasonable medical care that meets the community standard of medical care in a prison setting; (2) at no point in time did Defendants deny Plaintiff appropriate medical care or treatment or cause him to suffer in an inappropriate manner when they had knowledge of his need or request; (3) at no time did Defendants ignore, disregard, or act with deliberate indifference towards any of Plaintiff's medical needs; (4) all times relevant to this case, Defendants acted in good faith; and (5) in no way did Defendants implicitly authorize, approve, or knowingly acquiesce to, or personally participate in, any unconstitutional conduct concerning Plaintiff during his incarceration at SCCF. *Id.*

The Eighth Amendment guarantees adequate medical treatment, not the medical treatment of the inmate's choice; an inmate's desire for additional or different treatment does not

state a cause of action for deliberate indifference under the Eighth Amendment. *Estelle*, 429 U.S. at 106-107. The violation of a constitutional right is a condition precedent to prevailing on a §1983 claim in any capacity. Plaintiff's disagreement with the medical treatment he received during his incarceration does not mean that Defendants were deliberately indifferent to Plaintiff's serious medical needs; to the contrary, the record establishes that Defendants were responsive and provided adequate medical care. Accordingly, Plaintiff cannot establish the requisite underlying constitutional violation. Absent the requisite underlying constitutional violation, Plaintiff cannot sustain his § 1983 claims and Defendants are entitled to a judgment as a matter of law.

## IV. CONCLUSION

For the reasons discussed above, the undersigned finds that Plaintiff has failed to exhaust his administrative remedies as required under the PLRA. The undersigned further finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendants' Motions for Summary Judgment (Docket Nos. 38, 54) be GRANTED and that this action be DISMISSED WITH PREJUDICE.[5]

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this

---

[5] As noted, adoption of the instant Report and Recommendation will moot Docket Nos. 32, 45, and 49.

Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985),

*reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**

28